IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM A. BRACKEN,

                     Petitioner,

            vs.

NEIL MCDOWELL, Warden, Ironwood
State Prison,[1]

                     Respondent.

No. 2:15-cv-00408-JKS

ORDER
[Re: Motion at Docket No. 45]
and
MEMORANDUM DECISION

William A. Bracken, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Bracken is in the custody of the

California Department of Corrections and incarcerated at Ironwood State Prison.  Respondent

has answered, and Bracken has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On December 3, 2010, Bracken was charged in a 7-count information.  On direct

appeal of his conviction, the California Court of Appeal laid out the following facts underlying

this case:

> [Bracken] preyed on the children and grandchildren of friends.  He molested and
> sodomized John Doe III when he was between 11 and 17 years old; he repeatedly gave
> him marijuana and showed him pornography.  When John Doe II was nine years old,
> [Bracken] showed him pornography and asked him if he masturbated.  When John Doe I
> was seven years of age, [Bracken] showed him pornography and molested him.

---

[1]      Neil McDowell, Warden, Ironwood State Prison, is substituted for the People of
the State of California.  FED. R. CIV. P. 25(c); Rule 2(a), Rules Governing Section 2254 Cases in
the United States District Courts; *Stanley v. Cal. Supreme Court*, 21 F.3d 359, 360 (9th Cir.
1994).

An information alleged seven counts based on [Bracken's] actions: count 1, committing a lewd and lascivious act on John Doe I, a child under the age of 14 years; count 2, exhibiting harmful matter to a minor, John Doe II; count 3, committing a lewd and lascivious act on John Doe III, a child under the age of 14 years; count 4, sodomy on John Doe III, a child under the age of 14 years and more than 10 years younger than [Bracken], on or about June 2003 through August 2005; count 5, exhibiting harmful matter to a minor, John Doe III; count 6, sodomy on John Doe III, a child under the age of 18 years, on or about December 6, 2009; and count 7, giving marijuana to a minor over the age of 14 years.  The information also alleged that as to counts 1 and 3, [Bracken] committed the offenses against more than one victim within the meaning of [California Penal Code] sections 667.61, subdivision (b) and 1203.066, subdivision (a)(7).  [Bracken] entered pleas of not guilty to all counts and denied the enhancement allegations.  A jury trial followed and the following evidence was introduced at trial.

**Crimes Against John Doe I and John Doe II**

John Doe I and his half brother John Doe II lived with their father, T.W., whose parents were longtime friends of [Bracken].  [Bracken] lived in T.W.'s neighborhood when T.W. was a child.

John Doe I was born in 2003 and John Doe II was born in 1995.  John Doe I's stepmother D.W. and his sisters also lived with them.  M.M. is John Doe I's mother and is married to J.M.

When John Doe II was nine years old, he stayed overnight at [Bracken's] house.  [Bracken] offered him alcohol and marijuana but told him not to tell anyone.  John Doe II declined the alcohol but smoked some marijuana.

That evening, while John Doe II sat on [Bracken's] bed with him, [Bracken] turned on the television and showed John Doe II a pornographic video.  [Bracken] warned him not to tell his mother.  [Bracken] asked him if he thought the "girls were hot" and John Doe II said they were.  When [Bracken] asked him if he masturbated, he answered, "Yeah, but I'm not going to."  John Doe II then left the bedroom.

John Doe II told his sister S.W. about the incident.  He began to cry and asked her not to tell their parents.  John Doe II did not tell anyone else because he did not want to get [Bracken] in trouble.  He thought of [Bracken] as an uncle and wanted to protect him even though he knew what [Bracken] had done was wrong.

In the summer of 2010 M.M. and J.M. lived on [Bracken's] property.  M.M. and J.M. lived in a trailer without electricity or water.  According to D.W., M.M. and J.M. "had some issues with drinking [alcohol] at the time."  John Doe I and his two sisters sometimes stayed with M.M., and John Doe I would visit [Bracken].

On the July 4, 2010, weekend, M.M. and J.M. planned a camping trip at a lake with John Doe I, his sisters, and [Bracken].  On July 2, 2010, [Bracken] called D.W. and asked for T.W.  [Bracken] said John Doe I wanted to talk to D.W. John Doe I asked if he could ride in the motor home with the other kids.  D.W. agreed because she believed, mistakenly, that M.M. and J.M. were going along.

After they reached the lake, John Doe I and [Bracken] were alone in the motor home.  [Bracken] showed him pictures of naked bodies on his cell phone.  Although the

boy could not remember what the photos were of, he had never seen those kinds of photos before.  [Bracken] then showed him a pornographic movie featuring a little rhino.

After it got dark, John Doe I climbed into the upper bunk and [Bracken] offered him $20 to masturbate.  John Doe I did not know what the term meant and [Bracken] explained it by touching his own penis.  [Bracken] then masturbated John Doe I, placing one hand on the boy's penis and the other on his own.  [Bracken] rubbed John Doe I's stomach with lubricant and began rubbing John Doe I's penis.  [Bracken] spent the night in bed with John Doe I.

The next day [Bracken] gave John Doe I $20.  The boy used the money to buy things at the campground store.

The day after John Doe I and [Bracken] left for the lake, M.M. told D.W. that the pair had gone camping alone.  Although [Bracken] had promised to pay for the camping trip because M.M. and J.M. did not have any money, at the last minute [Bracken] said he could not afford to take everyone camping.

[Bracken] had lied to M.M., telling her D.W. had given John Doe I permission to camp alone with him.  When D.W. learned John Doe I was alone with [Bracken], she became upset and began trying to call [Bracken] to tell him to bring her stepson home.

When D.W. told John Doe II where John Doe I was, John Doe II became upset.  He was emotional and angry, telling D.W., "'You need to do something, mom.'"  When D.W. asked why, he told her about [Bracken's] showing him pornography.

D.W. continued to call [Bracken's] cell phone, and the next morning John Doe I answered it.  D.W. asked to speak with [Bracken], but John Doe I said he was not there.  She told him to have [Bracken] call her right away.  When [Bracken] returned her call, D.W. told him to bring John Doe I home.  [Bracken] said John Doe I wanted to stay another night, but D.W. told him to bring the boy home immediately.

After he returned, John Doe I spent the night in John Doe II's bedroom.  John Doe I asked John Doe II, "Have you ever meditated?" and John Doe II asked what he meant. John Doe I said, "Well, it's kind of gross, but [Bracken] said that you do it."  John Doe II asked, "Do you mean masturbate?" and John Doe I replied, "Yeah, masturbate. That's what I meant."  John Doe II asked what [Bracken] had told him and John Doe I replied: "Well [Bracken] told me that if I masturbated, he'd give me 20 bucks."  John Doe II told his parents.

When D.W. spoke with John Doe I alone, he told her he was alone with [Bracken] in the camper the first night.  He said [Bracken] showed him naked people on a phone.  [Bracken] asked him if he masturbated.  At first, [Bracken] was on one side of the motor home and John Doe I was on a different bed, masturbating with [Bracken's] encouragement.  [Bracken] then disrobed, got into bed with John Doe I, and rubbed something sticky from a bottle onto the boy's penis.

D.W. and T.W. did not report the incident for several weeks.  Meanwhile, D.W. attempted to dissuade T.W. from killing [Bracken].  T.W. did not want to report the molestation, because if he was able to kill [Bracken] he would get in trouble.

In October 2010 D.W. told a district attorney's investigator that [Bracken's] cell phone might contain pornographic images.  A few days later the investigator interviewed John Doe I, who told him that while they were camping [Bracken] showed him images on

his cell phone.  The pictures were of "'naked chicks, " a "girl's private which was talking," and "a guy with a huge nut sack."

The majority of the photos on [Bracken's] phone were of bestiality.  One was a photo of a man with large testicles who had his penis in a cow's mouth.  Other photos were of naked women.  Ten of the photographs were admitted into evidence.  The phone also contained a video of a talking vagina.

## Crimes Against John Doe III

When John Doe III was 10 years old he met [Bracken].  [Bracken] was a friend of John Doe III's grandparents and lived next door to them.  Over the years, [Bracken] entertained 40 to 50 children at his house.  At the time of trial, John Doe III was 18 years old.

While visiting his grandparents, John Doe III would spend time with [Bracken], playing video games and watching movies.  [Bracken] took him to Disneyland and to monster truck shows.  During this period, Steven M. and Joshua B. lived with [Bracken], and [Bracken] told John Doe III he had been having sex with both of them.

When John Doe III was 11 years old, [Bracken] paid him to help trim and water the marijuana growing at his house.  [Bracken] gave him marijuana daily when he was 11 and again when he was 13 to 17 years old.  [Bracken] gave him alcohol when he was 10 years old.  [Bracken] twice gave him enough alcohol to make him intoxicated.  He continued to give the boy alcohol until he moved away at age 17.  On six occasions, [Bracken] showed John Doe III pornography when they were alone.

When John Doe III was 11, [Bracken] told him, "'If you have sex with me, I'll pay you.'"  Although he did not understand what [Bracken] meant, he did what he was told.  [Bracken] sodomized John Doe III and then paid him.  [Bracken] told him not to tell anyone.  John Doe III feared [Bracken] but did not know what [Bracken] had done was wrong.

At the age of 16, John Doe III lived with [Bracken] for about a year.  During this period [Bracken] masturbated the teenager about five times and raped him seven or eight times.  The last assault took place in December 2009, when John Doe III was 17 years old.  [Bracken] offered to pay him, then sodomized him, and then paid him.  John Doe III moved out the next day.

## Expert Testimony

An expert, Catherine Golden of the district attorney's office, testified she had been trained in the psychology of victimization and had participated in hundreds of sexual abuse investigations.  She testified based on her training and investigatory experience.

A pedophile is a person who prefers having sex with children.  Grooming refers to the process by which a pedophile breaks down a child's inhibitions in order to molest the child without being discovered.  Golden testified that a child molester is not generally attracted to all children, but often is attracted to a certain type of child.

Golden stated there are three different categories of molesters: seductive pedophiles, introverted pedophiles, and sadistic pedophiles.  A seductive pedophile

employs six stages of grooming a victim: targeting a child, gaining the child's trust, filling a need of the child, isolating the child, sexualizing the child, and then controlling the child.  A seductive pedophile creates a relationship with the child victim, who comes to love the offender.

According to Golden, child molestation does not occur only in the absence of parental supervision or oversight.  The seductive pedophile targets the entire family.  Golden testified: "The family [of the victim] can be an intact family.  The family could be a family with one parent.  They find the needs of the family, and oftentimes they have to woo the parents to the point where if the child ever makes an accusation, the parents are already sold on the offender.  It would be shocking.  They wouldn't believe it."  When a child sees that his or her parents like the pedophile, the child also begins to trust that person.

The pedophile can exert control over a child through giving gifts and money.  He or she might also intimidate and threaten the victim with violence or humiliation.  Pedophiles can convince their victims no one will believe them, isolating the victims.

Golden stated that the type of pornography used in child molestation is not necessarily child pornography.  Pedophiles use pornography to stimulate their victims, so it can be any kind of pornography.  Showing the victim pornography further isolates the child and contributes to the sexualizing process.

Victims often fail to report molestations; some never reveal the abuse.  Some children report abuse immediately.  In Golden's experience, children's emotions about the abuse run the gamut, from anger and humiliation to regret for disclosing the abuse.  Although Golden knew of victims who gave inaccurate information, she never encountered a victim who falsely reported molestation.

**[Bracken's] Uncharged Offenses**

The prosecution presented evidence of [Bracken's] inappropriate acts with three other victims.

***Gary F.***

Gary F., 27 years old at the time of trial, lived in Siskiyou County from the ages of four to seven.  His father was [Bracken's] friend, and Gary's sister "knew him very well."  [Bracken] showed Gary pornography on several occasions.

[Bracken] molested Gary at least five times, beginning when he was four or five years old.  The molestations continued until Gary moved away around the age of seven.

The first molestation took place at [Bracken's] house.  Gary spent the night, and he and [Bracken] were lying together on [Bracken's] bed.  [Bracken] asked if he could touch Gary's stomach and legs.  [Bracken] then began touching Gary's penis and rubbed himself.

The second molestation took place in [Bracken's] vehicle.  While parked, [Bracken] asked if he could touch Gary, and Gary said yes.  [Bracken] masturbated Gary while touching himself.

The third molestation occurred after a truck race when Gary stayed with [Bracken] in a hotel. [Bracken] began touching Gary and asked if he could continue. Gary said yes. [Bracken] used a lubricant and ejaculated.

After Gary's parents told him he could not see [Bracken] anymore, Gary and [Bracken] went out in [Bracken's] car. [Bracken] masturbated him. On several occasions [Bracken] orally copulated Gary, but Gary could not remember when those molestations took place.

### Joseph P.

When Joseph P. was 13 years old he met [Bracken], who worked with Joseph's mother. [Bracken] was a friend of the family and Joseph spent time at [Bracken's] house.

At the age of 14, Joseph passed out in [Bracken's] camper after he and [Bracken] had been drinking. When Joseph woke up, he found [Bracken] orally copulating him. On another occasion when Joseph was 14, he drank with [Bracken] in the back of [Bracken's] car. [Bracken] then orally copulated Joseph.

### Josh T.

Josh T., who was 13 at the time of trial, lived near [Bracken] and spent time at his house. He played video games with [Bracken] and rode four-wheelers. Josh spent the night at [Bracken's] house with Josh's older brother, Adam, who was 14 at the time. The boys spent the night upstairs; [Bracken] slept downstairs.

One day when Josh and Adam were at [Bracken's] house, they had trouble with the television. [Bracken] put the television on a particular channel and left the room. Josh testified that on the television, "people started having sex." He provided details of the pornography, which involved adult sex, and testified he and Adam tried to change the channel. When [Bracken] returned, he said the movie was inappropriate and changed the channel to one showing cartoons.

**Defense Case**

[Bracken] presented testimony by several witnesses who had known him during the period in question.

### Eric Longhofer

Eric Longhofer, 31 at the time of trial, met [Bracken] when he was nine and spent time with him between the ages of 11 and 13. [Bracken] never made any sexual advances toward him. Longhofer's stepfather worked for the sheriff's department, and if [Bracken] had approached him sexually, Longhofer would have told his stepfather.

***RoseAnn Fogel***

RoseAnn Fogel met [Bracken] in 1988 after moving into a trailer near [Bracken's] parents' home.  At that time Fogel's children were four, six, eight, and 10 years old. [Bracken] and Fogel dated and had a sexual relationship for a few months.  She still considered [Bracken] a friend.  Fogel saw many other children spend time at [Bracken's] home; however, she never saw [Bracken] do anything that would concern her about his being sexually inappropriate around children.

***Joshua B.***

Joshua B., 25 at the time of trial, met [Bracken] through a friend when Joshua was 11 or 12.  Joshua's family lived across the street from [Bracken], and his father knew [Bracken].  Joshua and his friends spent time at [Bracken's] house, playing video games and riding dirt bikes.  He stayed overnight at [Bracken's] house twice a month.

[Bracken] had a variety of girlfriends.  He never made any sexual advances toward Joshua or showed him pornography.  Joshua never observed anything that made him concerned about [Bracken's] sexual practices.  According to Joshua, [Bracken] was not a child molester.

On the weekend of July 4, 2010, Joshua was with a girlfriend at the same lake where [Bracken] and John Doe I camped.  Joshua had known John Doe I's parents for 15 to 20 years and had seen John Doe I previously at [Bracken's] house.  When Joshua arrived at the lake, [Bracken] was setting up camp.

At [Bracken's] request, Joshua gave John Doe I a ride from the lake to the boy's grandparents' house.  John Doe I had not wanted to leave.

The day of [Bracken's] arrest, his home was burglarized.  [Bracken] asked Joshua to pick up all of his property at the jail.  Joshua picked up the items, including a cell phone. Joshua gave the phone to a district attorney's investigator; he did not delete anything from the phone.

In August 2010 Joshua saw [Bracken] with John Doe I's stepfather J.M. at [Bracken's] house.  They were talking about [Bracken's] request that J.M. vacate their rental on [Bracken's] property.  J.M. was drunk and angry, and the discussion deteriorated into a shouting match.  In the following weeks, Joshua saw J.M. driving down the road [Bracken] lived on, screaming obscenities.

***Steven M.***

Steven M. began spending time at [Bracken's] house when he was eight, and when Steven's father passed away, [Bracken] became a father figure to him.  Steven spent the night at [Bracken's] house about once a month.  [Bracken] took Steven on trips to monster truck shows and the beach.

At the age of 15 or 16, Steven moved in with [Bracken].  [Bracken] took him in because Steven's mother was involved with methamphetamine.  Steven lived with [Bracken] from 2002 until spring of 2009, when Steven turned 22.  Steven testified these were the best years of his life.

Steven testified that during the years he lived with [Bracken], [Bracken] was an alcoholic.  He drank a 12–pack of beer every day, beginning at any time between noon

and 2:00 p.m.  [Bracken] would not drive after 2:00 p.m. "because of drinking and driving."  [Bracken] also grew marijuana, and Steven cared for the plants when he was 19 to 21 years old.  Steven smoked marijuana for a total of nine years; he obtained a medical recommendation when he was 18.

According to Steven, [Bracken] did not act his age when Steven moved in with him but acted like a 15 to 16 year old.  He liked video games and riding four wheelers.

Right before Steven moved out of [Bracken's] house, he met John Doe III.  John Doe III was the grandson of [Bracken's] neighbor and spent time at [Bracken's] house playing video games.  John Doe III never appeared hesitant around [Bracken] and never confided in Steven.

Steven testified [Bracken] never approached him in a sexual way.  He never watched pornography with [Bracken].  [Bracken] showed him pictures on his cell phone, but they were not "pornography," just pictures of naked women.  In Steven's opinion, [Bracken] was not a child molester or a sexual deviant.

While Steven lived with him [Bracken] did not have a girlfriend, but Steven was "pretty sure [Bracken was] straight."  [Bracken] lost his trust in women because he had been hurt.

[Bracken] had a water bed.  Once when Steven was under the age of 15, [Bracken] covered his water bed mattress with baby oil, and he and Steven jumped on it clad only in their underwear.  Steven's mother expressed concern about the incident, but it was alleviated after she talked to [Bracken] and Steven.

Steven moved out because the rent became too high.  [Bracken] was charging him more than the entire amount of rent [Bracken] paid.  At the time of trial, [Bracken] was paying Steven $200 per month so that when he was released [Bracken] would have a place to stay.[FN1]

> FN1.   Steven was convicted of selling drugs in 2011.  He had sold $50 worth of marijuana.

***Carl P.***

[Bracken] is Carl P.'s uncle.  At the time of trial Carl was 29 years old.  When he was between the ages of three and seven, Carl and his family spent time at [Bracken's] house, and Carl spent the night there every few months.  Carl moved out of his family home at age 13 because his stepfather was an abusive alcoholic.  After he moved out, Carl spent the night at [Bracken's] house several nights a week.  While he was a teenager, Carl drank alcohol at [Bracken's] house and smoked marijuana [Bracken] gave to him. [Bracken's] house was full of children, many of whom were related to him.

Carl had slept in the same bed with [Bracken] when they went camping.  There was never any sexual contact between them, nor did [Bracken] ever do or say anything inappropriate.  Carl never observed anything that made him concerned about [Bracken's] relationship with children.  In Carl's opinion, [Bracken] was not a sexual deviant.  Carl had sent pornographic images to [Bracken].

[Bracken] also presented testimony by investigating detectives and John Doe I's mother and stepfather.

### Deputy Gabe Garrison

On August 31, 2010, Deputy Sheriff Gabe Garrison interviewed D.W., John Doe I's stepmother. D.W. said that on August 30, 2010, John Doe I told her [Bracken] had paid him $20 to masturbate. She had been waiting for John Doe I to bring it up, but he did not so she broached the subject with him.

### M.M.

John Doe I's mother testified that she had known [Bracken] for at least 19 years. She and her husband J.M. rented a house from [Bracken] in the spring of 2010. M.M. trusted [Bracken], considered him a friend, and allowed John Doe I to spend time with him.

M.M. lived near [Bracken] for 10 years, and she brought her children to his house and saw other children there. [Bracken] kept lots of toys at his house as well as video games and four-wheelers. M.M. testified that both she and [Bracken] were alcoholics.

Both M.M. and J.M. had cell phones. John Doe I was not allowed to play with their phones because they had inappropriate pictures on them. [Bracken] sent some of the inappropriate pictures to M.M., including a video of a talking vagina that he sent during the summer of 2010.

According to M.M., she did not quarrel with [Bracken] prior to the molestation allegations. The family decided to move after the molestation allegations were made. Within two weeks of learning of the allegations, M.M. and J.M. left the house they had rented from [Bracken]. At the time of trial they were living in a trailer parked behind a friend's house.

In August 2010 D.W. told M.M. that John Doe I had made upsetting comments and that she would get back to M.M. about them. A month and a half later, D.W. told M.M. about the molestation allegations. M.M. did not report the allegations herself because D.W. told her that she and T.W. were "taking care of the matter." M.M. gave a statement after the police contacted her.

John Doe II told M.M. about watching pornography at [Bracken's] house. He said it made him uncomfortable and he wanted to leave.

M.M.'s family had a tradition of camping at the lake every Fourth of July. In 2010 they could not pay the camping fee. [Bracken] offered to pay the fee, but they decided they did not have enough money for other expenses. M.M. told [Bracken] that he needed to get permission from D.W. and T.W. to take John Doe I camping. [Bracken] told her he had received D.W.'s permission. That same day [Bracken] and John Doe I left on the camping trip.

### Detective Bob Buker

Detective Bob Buker interviewed John Doe III on October 6, 2010. John Doe III told the detective that he and [Bracken] had sex twice. The first time was possibly in 2006, when he was 11 years old.

Buker also interviewed M.M., who said she had not spoken to John Doe I about the molestation.  John Doe I did not appear to be traumatized, but she believed he probably was "a little bit."  M.M. told Buker that John Doe II had walked into [Bracken's] room while [Bracken] was watching pornography; it made him uncomfortable and he left the room.

### J.M.

J.M. testified that in June 2010 [Bracken] sent a video of a talking vagina to M.M.'s cell phone.

## Rebuttal

The prosecution presented testimony by several witnesses in rebuttal.

### J.M.

During rebuttal, J.M. reconsidered the date on which M.M. had received the talking vagina video.  It was not until after July 31, 2010, that he and M.M. purchased a phone that could send and receive videos.  Therefore, [Bracken] could not have sent the video until after July 31.

J.M. and M.M. paid [Bracken] $200 a month in rent during the summer of 2010. Prior to the molestation allegations, the couple were good friends with [Bracken], whom they trusted.  On August 26, 2010, J.M. spoke with [Bracken] about continuing to live on his property.  Joshua B. was not there.  [Bracken] said someone told him M.M. was spreading rumors about his being a child molester.  The couple owed [Bracken] $100 in rent.  [Bracken] said they could no longer stay there because M.M. was falsely accusing him of molestation.  [Bracken] called the landowner and said J.M. had stolen "stuff." [Bracken] told J.M. the landlord was coming to help evict him.  J.M. denied yelling obscenities at [Bracken] while driving.  J.M. had a 2002 conviction for a crime of moral turpitude.

### Karen Simas

Karen Simas, a victim services advocate for the district attorney's office, observed John Doe I's testimony at trial.  Simas noted that at a certain point in his testimony, John Doe I's answers slowed, and he lowered his head and took a long pause before answering one of counsel's questions.  The court then called a break.  During the break, John Doe I spoke with D.W., who had been present during his testimony.  When the trial recommenced, D.W. did not return, but T.W. remained during John Doe I's testimony.

***Catherine Golden***

Golden interviewed Steven M. in August 2011.  Steven told Golden that when he was 16 or 17, [Bracken] showed him a box of pornographic magazines.  The incident with the oiled water bed mattress took place when Steven was 12 years old.  His mother was very upset about the incident and questioned Steven about whether [Bracken] had touched him inappropriately.  Steven told Golden [Bracken] always slept in the nude.

**Verdict and Sentencing**

The jury convicted [Bracken] on all charges and found true the multiple victims allegation.  The court sentenced [Bracken] to 30 years to life plus seven years in prison: count 1, 15 years to life; count 2, eight months (one-third the midterm), to be served consecutively to count 1; count 3, 15 years to life, to be served consecutively to count 1; count 4, eight years (the upper term), stayed pursuant to section 654; count 5, eight months (one-third the midterm), to be served consecutively to count 1; count 6, eight months (one-third the midterm), to be served consecutively to count 1; and count 7, five years (the upper term), to be served consecutively to count 1.  In addition, the court ordered [Bracken] to pay $37,000 in attorney fees, $10,000 in defense investigation fees, and victim restitution, fines, and fees . . . .

*People v. Bracken*, No. C069541, 2014 WL 210591, at *1-9 (Cal. Ct. App. Jan. 17, 2014).

Through counsel, Bracken appealed his conviction, arguing that: 1) the trial court erroneously admitted images found on Bracken's cell phone; 2) the trial court erred in failing to give a limiting instruction on the proper uses of the prosecution's expert testimony; 3) the evidence presented was insufficient to support his two convictions for exhibiting harmful matter to a minor with the intent of seduction; 4) the cumulative effect of the above errors warranted reversal; and 5) the trial court erred in imposing attorney fees and ancillary costs because there was insufficient evidence of Bracken's ability to pay.  The Court of Appeal unanimously affirmed the judgment against Bracken in an unpublished, reasoned decision issued on January 17, 2014.  *Bracken*, 2014 WL 210591, at *18.  Bracken petitioned for review in the California Supreme Court, which was denied without comment on April 23, 2014.

Bracken then filed a *pro se* petition for habeas relief in the California Superior Court.  In that petition, he raised the same claims he had unsuccessfully raised on direct appeal.  The superior court denied the petition on July 30, 2014, concluding that he failed to make a prima facie claim for relief.

Bracken filed an additional *pro se* habeas petition in the superior court alleging that: 1) the prosecutor and the prosecutor's expert witness committed perjury; 2) the court erred in allowing the expert witness to testify and by failing to give a *sua sponte* limiting instruction with respect to her testimony; 3) the court erred when it failed to properly instruct the jury after a sick juror was excused; 4) the prosecutor failed to disclose exculpatory evidence; 5) the court erred in admitting the testimony of Gary F.; 6) the court erred in admitting the testimony of Joe P.; 7) the court erred "when the prosecution hid favorable evidence;" 8) the court erred with respect to false evidence obtained by the prosecution; 9) the court erred in admitting evidence from his cell phone; 10) "[t]he court erred when the prosecution hid favorable evidence . . . [relating to] Detective Bob Baker's interview" with a victim; 11) the court made a sentencing error; 12) the cumulative effect of the errors warrants reversal of his convictions; 13) the court erred in admitting the testimony of John Doe III and failing to disclose evidence relating to his gang involvement and narcotics addiction; 14) the prosecution committed gross misconduct and malicious prosecution; 15) the court erred by refusing to restart jury selection after a victim's father talked to jurors and jurors saw Bracken in shackles; and 16) his conviction was obtained as a result of "outrageous gove[r]nmental misconduct."  On October 10, 2014, the superior court summarily denied the petition for failure to state a prima facie claim.

Bracken additionally file a third *pro se* habeas petition to the superior court.  This time, Bracken argued that: 1) the trial court erroneously admitted evidence from his cell phone; 2) the trial court failed to *sua sponte* issue a limiting instruction on the prosecution's expert testimony; 3) there was insufficient evidence to sustain his convictions for exhibiting harmful matter to a minor with the intent of seduction; 4) the prosecutor and expert witness committed perjury; 5) the court erroneously admitted the testimony of Joe P.; 6) the court erroneously admitted the testimony of Gary F.; 7) the court erroneously admitted the testimony of John Doe III and failed to disclose evidence relating to his gang affiliation and narcotics addiction; 8) the court "prejudicially erred when the prosecution failed to disclose to the jury exculpatory evidence;" 9) the prosecution committed gross misconduct and malicious prosecution; 10) the prosecution committed gross misconduct with respect to their obtaining images from Bracken's cell phone; 11) his conviction was "obtained as a result of outrageous gove[r]nmental misconduct;" 12) law enforcement officers coerced a statement from one of the victims; 13) the trial court made a sentencing error; 14) the court erred in failing to restart jury selection after the father of two of the victims was seen talking to jurors and the jurors saw Bracken in shackles; 15) the court misinstructed the jury after it excused an ill juror; and 16) the cumulative effect of the errors warrants reversal of his conviction.  The superior court denied the petition with citations to *In re Harris*, 855 P.2d 391 (Cal. 1993) (denying claims that were part of the record and could have been, but were not, raised on direct appeal), and *In re Waltreus*, 397 P.2d 1001 (Cal. 1965) (stating that, where a petitioner's arguments were presented in a direct appeal to the California courts, a habeas corpus petition in the California courts "ordinarily cannot serve as a second appeal") The court additionally stated that Bracken failed to make a prima facie claim for relief.

Bracken then filed a *pro se* habeas petition in the Court of Appeal, raising the same 16 claims he raised in his third habeas petition in the superior court.  The Court of Appeal denied the petition without comment on January 15, 2015.  He then raised those claims in a habeas petition in the California Supreme Court, which was summarily denied on April 1, 2015.

While his petition to the Supreme Court was pending, Bracken timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on January 29, 2015.  *See* 28 U.S.C. § 2244(d)(1)(A).  Bracken subsequently filed an Amended Petition (Docket No. 9), which has been transferred to the undersigned judge and is ripe for adjudication.  Also pending before this Court is Bracken's motion for an evidentiary hearing as to the claims raised in the Petition. (Docket No. 45).

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Bracken argues that: 1) the trial court erroneously admitted evidence from his cell phone; 2) the trial court failed to *sua sponte* issue a limiting instruction on the prosecution's expert testimony; 3) there was insufficient evidence to sustain his convictions for exhibiting harmful matter to a minor with the intent of seduction; 4) the prosecutor and expert witness committed perjury; 5) the court erroneously admitted the testimony of Joe P.; 6) the court erroneously admitted the testimony of Gary F.; 7) the court erroneously admitted the testimony of John Doe III and failed to disclose evidence relating to his gang affiliation and narcotics addiction; 8) the court "prejudicially erred when the prosecution failed to disclose to the jury exculpatory evidence;" 9) the prosecution committed gross misconduct and malicious prosecution; 10) the prosecution committed gross misconduct with respect to their obtaining images from Bracken's cell phone; 11) his conviction was "obtained as

a result of outrageous gove[r]nmental misconduct;" 12) law enforcement officers coerced a

statement from one of the victims; 13) the trial court made a sentencing error; 14) the court erred

in failing to restart jury selection after the father of two of the victims was seen talking to jurors

and the jurors saw Bracken in shackles; 15) the court misinstructed the jury after it excused an ill

juror; and 16) the cumulative effect of the errors warrants reversal of his conviction.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.   Evidentiary Errors (Grounds 1, 5, 6, 7, 8, 10, 12)

Bracken first challenges his conviction by arguing that the trial court made errors by allowing inadmissible evidence and precluding impeachment evidence. The Supreme Court has

acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The erroneous admission of evidence does not provide a basis for federal habeas relief unless it rendered the trial fundamentally unfair in violation of due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis omitted). A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983)).

1.     *Images on cell phone*

Bracken first argues that the trial court erred in admitting John Doe I's statement that Bracken showed him pornography on his phone as well as the images found on the cell phone. The California Court of Appeal rejected this claim on direct appeal after determining that the admission of the evidence was proper under California law.

Bracken contends that the evidence should have been excluded under California Evidence Code section 352, and the inflammatory nature of the evidence violated his federal right to a fair trial.  Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Here, the appellate court found that the trial judge properly conducted the weighing process recognized by Evidence Code section 352 and that the evidence was properly admitted. This Court must defer to the state appellate court's determination of state law.  *Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Bains v. Cambra*, 204 F.3d 964, 972 (9th Cir. 2000).  Thus, state law was not violated by the admission of the evidence.  Indeed, to the extent that Bracken asserts an error under California evidentiary law, such claim is not cognizable on federal habeas review. The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp*

*v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights.  *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Moreover, Bracken cannot show that the admission violates federal due process.  "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process."  *Holley*, 568 F.3d at 1101 (9th Cir. 2009).  "Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Id.* (citing *Williams*, 529 U.S. at 375).  Absent such "clearly established Federal law," it cannot be concluded that the appellate court's ruling was an "unreasonable application."  *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable).  Bracken is therefore not entitled to relief on this claim.

  2.  *Testimony of John Doe III*

Bracken additionally argues, as he did on state habeas, that the trial court erred in admitting John Doe III's testimony without also admitting evidence of his gang affiliation and drug addiction.  John Does III's mother stated that she had sent the boy to live with Bracken because he was addicted to methamphetamine and was "a handful."  Bracken contends that the exclusion of this information was improper because "[t]he prosecution must disclose the

existence of any felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial" and any exculpatory evidence.

It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense.  *See Washington v. Texas*, 388 U.S. 14, 19 (1967).  However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988).  States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials.  *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006).  "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury.  The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate."  *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Under these guidelines, this Court cannot find that the trial court's denial of Bracken's request was an abuse of discretion or unreasonable or contrary to federal law.  As an initial matter, the Supreme Court has not yet "squarely addressed" whether a state court's discretionary exclusion of evidence can ever violate a defendant's right to present a defense.  *See Moses v. Payne*, 555 F.3d 742, 758-59 (9th Cir. 2008) (considering challenge to state evidentiary rule allowing discretionary exclusion of expert testimony favorable to defendant); *see also Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (noting that no Supreme Court case has squarely

addressed this issue since *Moses*).  Thus, the state court's decision could not have contravened clearly established federal law under AEDPA.  *Id.*; *see Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008).

Moreover, to the extent that clearly established federal law is implicated by such a claim, federal law requires that a petitioner demonstrate that the trial court excluded "trustworthy and necessary exculpatory testimony."  *Cudjo v. Ayers*, 698 F.3d 752, 754 (9th Cir. 2012) (citing *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973).  A petitioner must show that the third-party evidence was "inconsistent with" and "raise[d] a reasonable doubt of" his guilt.  *Holmes*, 547 U.S. at 327.  Bracken fails to meet this standard as the excluded evidence"d[id] not tend to prove or disprove a material fact in issue at [his] trial."  *Id.*  11-12.

Finally, the trial court acted well within its discretion and within the bounds of the Confrontation Clause in determining that the limited probative value of the evidence was outweighed by the undue consumption of time that the presentation of such evidence would require as well as the danger of confusion to the jury.  *See United States v. Scheffer*, 523 U.S. 303, 314 (1998) (noting that "collateral litigation prolongs criminal trials and threatens to distract the jury from its central function of determining guilt or innocence").  Although his theory of relevance is unclear, it appears that Bracken did not argue that he should have been able to cross-examine the witness on these grounds, but that he should be able to introduce extrinsic evidence of his drug addiction and gang affiliation.  But the trial court properly determined that evidence of drug use or gang membership was not sufficiently relevant in a case that did not directly involve drug use or gang membership.  For the foregoing reasons, Bracken is not entitled to relief on this claim.

3.     *Propensity evidence (testimony of Joe P. and Gary F.)*

Bracken also alleges that the trial court erred in admitting the testimony of Joe P. and Gary F. that Bracken sexually molested them.

California Evidence Code § 1108 allows the prosecution to prove a defendant's propensity to commit sex crimes by offering evidence that he has committed other sex crimes.  It is an exception to the general rule, reflected in § 1101, that propensity evidence is not admissible.  *See* CAL. EVID. CODE §§ 1101(a), 1108(a).  The relevant portion of § 1108 provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  Section 1108 is analogous to Federal Rule of Evidence 413, which provides that, "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault."  FED. R. EVID. 413(a).

As an initial matter, Bracken cannot prevail on this claim because, again, "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected."  *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987).  So, even if the trial court erred in its application of §§ 352 and 1108, such error is not a ground for federal habeas relief.  *See Estelle*, 502 U.S. at 67-68.  Indeed, Bracken cannot demonstrate that the trial court committed error.  The record reflects that the trial court properly weighed the evidence against its potential to cause prejudice and instructed the jury that it may, but was not required, to infer from the evidence that he had a disposition to commit sexual offenses.

Moreover, the Ninth Circuit has repeatedly barred federal habeas petitioners from challenging the constitutionality of prior sexual misconduct evidence admitted to show propensity pursuant to California Evidence Code § 1108.  *See, e.g., Greel v. Martel*, 472 F. App'x 503, 504 (9th Cir. 2012) ("Ninth Circuit precedent 'squarely forecloses [the] argument' that admission of evidence of sexual misconduct to show propensity violates due process.") (quoting *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008)); *Sanches v. Hedgpeth*, 381 F. App'x 710, 711 (9th Cir. 2010) ("[T]he Supreme Court has never held that the admission of prior sexual misconduct to lend credence to a victim's claims to be unconstitutional."); *Mejia*, 534 F.3d at 1046 (on AEDPA review, upholding admission of evidence of prior uncharged sexual offenses in support of rape charges).  In so holding, the Ninth Circuit has cited the United States Supreme Court's express refusal to decide the issue.  *See Estelle*, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").  Bracken is therefore not entitled to relief on this ground.

B.    <u>Instructional Errors (Grounds 2, 15)</u>

Bracken next contends that the trial court made two errors with respect to the instructions to the jury.  Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw*, 546 U.S. at 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error,

therefore, "does not alone raise a ground cognizable in a federal habeas proceeding."
*Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See*

-24-

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is whether the trial

court's refusal to give the requested instruction "so infected the entire trial that the resulting

conviction violates due process."  *See id.* at 156-57; *Estelle*, 502 U.S. at 72.  Moreover, even if

the trial court's failure to give the instruction violated due process, habeas relief would still not

be available unless the error had a "substantial and injurious effect or influence in determining

the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519

U.S. 2, 5 (1996).

     1.    *CALCRIM No. 1193*

     Bracken alleges that the trial court erred in failing to *sua sponte* give the limiting

instruction found in CALCRIM No. 1193, which informs the jury that an expert's testimony

"about child sexual abuse accommodation syndrome is not evidence that the defendant

committed any of the crimes charged" and that it may "consider this evidence only in deciding

whether [the alleged victim's] conduct was inconsistent with the conduct of someone who has

been molested, and in evaluating the believability of [his] testimony."  The Court of Appeal

described the following facts underlying this claim:

> During trial, the prosecution, through expert Catherine Golden, sought to present
> evidence to rebut a series of misconceptions about child molestation.  The
> misconceptions were (1) a child molester is attracted to all children and awaits only the
> opportunity, (2) child molestation is an act of violence, (3) child molestation involves
> only children with inadequate parental oversight, (4) child molestation is done only for
> the pleasure of the molester, (5) sexual material used in molestation is child pornography,
> and (6) a child will immediately and accurately report molestation.  Defense counsel
> objected; the court overruled the objection.  Golden testified as summarized ante . . . .
>     [Bracken] contends that given Golden's testimony, the court should have
> instructed sua sponte with CALCRIM No. 1193, which states: "You have heard
> testimony from [expert] regarding child sexual abuse accommodation syndrome.
>     "[Expert's] testimony about child sexual abuse accommodation syndrome is not
> evidence that the defendant committed any of the crimes charged against (him/her).

"You may consider this evidence only in deciding whether or not [names of alleged victims'] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

The court did instruct the jury with a modified version of CALCRIM No. 303: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other.

"Some of this evidence was admitted to show the circumstances of the reports of sexual abuse made by some of the witnesses. You may not use this evidence for the truth of the words used in the reports of sexual offenses, but only to establish the fact of, and the circumstances surrounding, the victim's disclosure of the offense(s) to others in your determination of whether the offense(s) occurred.

"The testimony of Gary [F.] and Joseph [P.], relating to allegations of sexual offenses by [Bracken] that are not charged in this case, may be considered for a limited purpose if you determine that they have been proven by a preponderance of the evidence. Further instructions on the burden of proof for this evidence, the elements of these alleged uncharged offenses, and the limited purpose for which this evidence may be used, are defined further in these instructions. You may consider this evidence only for the purpose(s) provided in those instructions."

*Bracken*, 2014 WL 210591, at *12.

The appellate court rejected Bracken's instructional error claim after concluding that, even if the trial court had committed error in failing to give a CALCRIM No. 1193 charge, any such error was harmless. It reasoned:

Golden did not testify about [Bracken] or any of the facts specific to this case. Her testimony was generic. The prosecution told the jury Golden's testimony covered possible misconceptions by the public about child molestation. During closing argument, the prosecution reiterated that Golden testified about misconceptions the general public may have. Defense counsel, during closing argument, also reminded the jury that Golden's testimony focused on the common misperceptions about child molestation.

The trial court instructed the jury that in considering expert testimony, it "must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide . . . . You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.) Golden's testimony . . . was couched in general terms, describing behavior common to many abuse victims, not the victims in this case. Given that the court instructed the jury that it could reject Golden's testimony, we find it not reasonably probable [Bracken] would have received a more favorable verdict had the instruction been given.

-26-

*Id.* at *13.

As previously mentioned, a claim of jury instruction error is likewise reviewed under a harmless error standard on federal habeas review. *Evanchyk v. Stewart*, 340 F.3d 933, 940-41 (9th Cir. 2003). Habeas relief is only available where the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice." *Brecht*, 507 U.S. at 637; *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008). The relevant question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Elofus*, 598 F.3d 1171, 1174 (9th Cir. 2010).

On independent review, this Court likewise concludes that any instructional error was harmless. The Court of Appeal's harmlessness determination is both reasonable and fully supported by the record. Bracken has not established any likelihood that he was prejudiced by the instructions or that the jury would have reached a different verdict had it received the charge Bracken now believes to be appropriate. *Brecht*, 507 U.S. at 637. The Court thus finds no basis to believe that Bracken's conviction was the result of an "extreme malfunction" of the state criminal justice system." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Bracken is therefore not entitled to relief on this ground.

2.    *CALCRIM No. 3575*

Bracken additionally contends that the trial court erred by failing to instruct the jury with CALCRIM No. 3575, which tells the jury that it must begin its deliberations anew, after the court replaced a sick juror with an alternate. However, the record reflects that, contrary to Bracken's assertion, the trial court properly instructed the jury with CALCRIM No. 3575 after the substitution. Habeas relief is thus not warranted on this claim.

C.    <u>Sufficiency of the Evidence (Ground 3)</u>

Bracken also alleges that there was insufficient evidence to support his convictions for exhibiting harmful matter to a minor with the intent to seduce.  As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16.  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546

U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the

state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be

accepted by federal courts as defining state law . . . .").  "Federal courts hold no supervisory

authority over state judicial proceedings and may intervene only to correct wrongs of

constitutional dimension."  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith

v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

      Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if

accepted as credible by the trier of fact, sufficient to sustain conviction.  *Schlup v. Delo*, 513

U.S. 298, 330 (1995).  The United States Supreme Court has recently even further limited a

federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the

jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have

agreed with the jury."  *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam).  *Jackson* "makes

clear that it is the responsibility of the jury—not the court—to decide what conclusions should

be drawn from evidence admitted at trial."  *Id.* at 3-4.  Under *Cavazos*, "a federal court may not

overturn a state court decision rejecting a sufficiency of the evidence challenge simply because

the federal court disagrees with the state court.  The federal court instead may do so only if the

state court decision was 'objectively unreasonable.'"  *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S.

766, 773 (2010)).

      Bracken argues that the evidence did not demonstrate that the material he showed John

Does II and John Doe III constituted harmful matter or that he showed them the material with the

intent to seduce.  The Court of Appeal described the elements of counts 2 and 4 as follows:

        Section 288.2, subdivision (a) states: "Every person who, with knowledge that a
        person is a minor, or who fails to exercise reasonable care in ascertaining the true age of

a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means, including, but not limited to, live or recorded telephone messages, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor, is guilty of a public offense . . . ."

Section 313, subdivision (a) defines "harmful matter": "'Harmful matter' means matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

The definition of harmful matter under section 313 essentially tracks the three-pronged test for obscenity set forth in *Miller v. California* (1973) 413 U.S. 15, 24 [37 L.Ed.2d 419] (*Miller*): (1) whether the average person, applying contemporary community standards, would find the work appeals to the prurient interest; (2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined in state law; and (3) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.  (*People v. Hsu* (2000) 82 Cal.App.4th 976, 992.)

As one court has explained: "Thus, the modern *Miller* standard and the current definition of 'harmful matter' in section 313 are virtually identical, with the exceptions that under section 313 the relevant community standard by which the material is evaluated is 'statewide' and, in context, the work must lack serious literary, artistic, political, or scientific value for minors.  In essence, then, to fall within the terms of section 288.2, subdivision (a), the material exhibited to the minor must be 'obscene' as defined by *Miller*, except that its socially redeeming values must be of a nature that can be appreciated by a minor.  [Fn. omitted; citation.]  If this test is not met, there is no violation of section 288.2, subdivision (a) even if the other elements of that statute are met."  (*People v. Dyke* (2009) 172 Cal. App. 4th 1377, 1383 (*Dyke*).)
. . . .

The seducing element of section 288.2, subdivision (b) requires that the perpetrator intended to entice the minor to engage in a sexual act involving physical contact between the perpetrator and the minor. Intending to entice a male minor to masturbate himself does not satisfy the seducing element of the statute.  (*People v. Jensen* (2003) 114 Cal. App. 4th 224, 239-240.)  The purpose of section 288.2 is to prohibit using obscene material, as defined in section 313, subdivision (a), to groom young victims for molestation.  (*Powell*, *supra*, 194 Cal. App. 4th at p. 1287.)

The court instructed the jury that "An intent may be proved by circumstantial evidence."  (CALCRIM No. 225.)  The court also instructed on the distinction between direct and circumstantial evidence: circumstantial evidence is "evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question."  (CALCRIM No. 223.)

Rarely will the intent to seduce be susceptible to direct proof.  By its nature, seduction often involves persuasion by subtle means.  A seducer does not often declare his intentions.

-30-

*Bracken*, 2014 WL 210591, at *13-16.

In support of his claims that the evidence was insufficient to prove the above elements, Bracken argues that the evidence against him merely raised "a strong suspicion" of guilt such that the finding against him was based upon "conjecture or surmise." But all of the evidence in support of his claim was before the jury for its assessment. This Court is precluded from re-weighing the evidence. *Schlup*, 513 U.S at 330. In rejecting this claim on direct appeal, the Court of Appeal reasoned:

> In count 2, John Doe II spent the night at [Bracken's] home. [Bracken] offered him beer and marijuana, and turned on the television. John Doe II saw "two naked chicks" on a bed, kissing and touching. He saw their bodies, including their genitals. When [Bracken] asked him if he thought the girls were "hot," he agreed one was. [Bracken] asked him if he masturbated. He said yes, "but I'm not going to," and left the room.
>
> John Doe II testified pornography meant people doing "sexual things, naked, like in a bedroom setting or something, on recording or pictures." He explained the difference between an R-rated movie with nudity and a pornographic movie is that an R-rated movie is "not just sex. It like has a plot or something, like it tells a story, and a porno is just people having sex, naked, and like laying on a bed and, yeah, stuff like that." John Doe II had watched pornographic movies when he was seven or eight years old. He and his sister were on their own because their mother was drinking a lot.
>
> In count 5, when John Doe III was around 12 or 13 years old, [Bracken] showed him pornography. John Doe III testified he saw a naked man and woman having sex in a video. He could see their genitals. [Bracken] showed John Doe III pornography at least five times. When John Doe III was 11, [Bracken] asked him to have sex with [Bracken] for money. [Bracken] had "sex with [him] in [his] butt," using his penis. John Doe III and [Bracken] masturbated together about five times.
>
> . . . .
>
> Here, the evidence meets the minimum required for a reasonable trier of fact to conclude [Bracken] forced the victims to watch obscene depictions within the meaning of section 313, subdivision (a), an act punishable under section 288.2, subdivision (a).
>
> . . . .
>
> [I]n count 2, [Bracken] gave John Doe II alcohol and marijuana, and then showed the boy pornography and told him not to tell his mother. The object of his enticements was reasonably clear from these acts alone and was made even clearer in [Bracken's] questions of whether John Doe II thought the women in the movie were "hot" and whether he masturbated. From these facts the jury could infer that [Bracken] showed

John Doe II the pornography, and gave him the alcohol and marijuana, to lessen John
Doe II's inhibitions to engage in sex.

        With regard to count 5, the evidence is even more compelling. [Bracken] had a
long history of plying John Doe III with alcohol and marijuana, beginning when he was
10 years old. [Bracken] showed him pornography six times over the years. [Bracken]
molested him the first time when he was 11. He sodomized John Doe III and then paid
him. From these facts the jury could find circumstantial evidence that [Bracken's]
showing his victim pornographic material was part and parcel of [Bracken's] efforts to
entice him to continue to engage in sexual acts. We find sufficient evidence to support
[Bracken's] convictions on counts 2 and 5.

*Bracken*, 2014 WL 210591, at *14-16.

Viewing that evidence in the light most favorable to the verdict, a reasonable juror could

certainly infer that Bracken was guilty of showing harmful matter to John Doe II and John Doe

III with the intent to seduce. Although it might have been possible to draw a different inference

from the totality of the evidence, this Court is required to resolve that conflict in favor of the

prosecution. *See Jackson*, 443 U.S. at 326. Thus, considering the deference owed under

*Jackson*, *Cavazos*, and the AEDPA, this Court concludes that there was sufficient evidence

introduced at trial from which a rational trier of fact could have found beyond a reasonable doubt

that Bracken was guilty of counts 2 and 5, showing harmful matters to minors with the intent to

seduce. Bracken is therefore not entitled to relief on his insufficiency of the evidence claim.

D.    <u>Prosecutorial Misconduct (Grounds 4, 9, 11)</u>

        Bracken additionally argues that the prosecutor committed misconduct in a number of

ways. To successfully raise a claim cognizable on habeas review based on a prosecutor's

comments at trial, a petitioner must demonstrate that the prosecutor's comments "'so infected the

trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v.

Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

(1974)). Under this standard, only egregious prosecutorial misconduct can give rise to a

constitutional claim.  *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).  A prosecutor's

comments in summation constitute grounds for reversal only when the remarks caused actual

prejudice.  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to

claim of prosecutorial misconduct in summation).  Moreover, a prosecutor must have

"reasonable latitude" to fashion closing arguments.  *United States v. Molina*, 934 F.2d 1440,

1445 (9th Cir. 1991).

     1.    *Perjury of prosecutor and expert witness*

Bracken argues that both the prosecutor and the prosecution's expert witness Catherine

Golden committed perjury that warrants reversal of his conviction.  "[T]he [Supreme] Court has

consistently held that a conviction obtained by the knowing use of perjured testimony is

fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false

testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97,

103 (1976) (footnotes omitted).  The essential elements of such successful claim are that (1) the

testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured,

and (3) the false testimony was material.  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en

banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926,

959 (9th Cir. 2001).  Thus, if Bracken successfully shows that the prosecutor knowingly elicited

perjured testimony material to his case, habeas relief may be warranted.

Although the prosecutor has a duty to refrain from knowingly presenting perjured

testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the record does not

support Bracken's unsupported contention that the prosecution knowingly introduced perjured

testimony.  According to Bracken, Golden, a member of the District Attorney's Bureau of

Investigation who testified as an expert on pedophilia, testified that she had no direct

involvement in Bracken's case, but she had actually interviewed one of the prosecution's

witnesses.  But the record is clear that Golden testified that, as Bracken alleges, she interviewed

prosecution witness Steven M. in August 2011.  The Court of Appeal decision summarizes her

testimony regarding the interview, and importantly, defense counsel was able to thoroughly

cross-examine her about it.  Bracken thus cannot show that the prosecution hid or lied about

Golden's involvement in the investigation against Bracken.  Because Bracken cannot show that

Golden's testimony was false, he cannot show that the prosecutor committed misconduct with

regard to that testimony, and he cannot prevail on this claim.

       2.     *Malicious prosecution*

       Although his exact claim is unclear, Bracken contends that he was the victim of

"malicious prosecution" and "outrageous governmental conduct."

       As an initial matter, it is doubtful whether malicious prosecution claims are cognizable

on federal habeas review.  *See Jaime v. Almager*, No. 08-cv-0093, 2009 WL 2390853, at *15

(C.D. Cal. 2009) ("[T]he Supreme Court has never found that a malicious prosecution claim is

cognizable on habeas review.").  Even assuming that such a claim is cognizable, an essential

element of a malicious prosecution claim is the "termination of the prior criminal proceeding in

favor of the accused."  *See Heck v. Humphrey*, 512 U.S. 477, 484 (1994) (citations omitted).

Bracken fails to make such a showing here.

       To the extent that Bracken alleges that the decision to prosecute was based on

unconstitutional motives, such a claim is not supported by the record.  Generally, as long as "the

prosecutor has probable cause to believe that the accused committed an offense defined by

-34-

statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Further, "'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Bracken has not provided any evidence to indicate that the prosecutor singled petitioner out because of some discriminatory, vindictive, or otherwise improper motive, or lacked probable cause for the charges that were filed. Accordingly, federal habeas relief is not warranted on this claim.

3.     *Coerced statement*

Bracken also appears to re-assert his claim, raised to the state courts in a habeas petition, that the statement given by a victim to law enforcement was coerced and therefore improperly admitted at trial.

In *Payne*, the United States Supreme Court declared that a petitioner's coerced confession could not be used before a jury over the petitioner's objection because it violated the petitioner's constitutional rights. *Payne v. Arkansas*, 356 U.S. 560, 567 (1958). In *Jackson*, the Court found that a conviction based on a defendant's involuntary confession, "without regard for the truth or falsity of the confession," deprived the defendant of his Fourteenth Amendment rights. *Jackson v. Denno*, 378 U.S. 368, 376 (1964). The Supreme Court later explained that its decision in *Jackson* was "designed to safeguard the right of an individual . . . not to be compelled to condemn himself by his own utterances." *Lego v. Twomey*, 404 U.S. 477, 485 (1972). Likewise the use of a defendant's coerced confession to a psychiatrist, who was the paid

representative of the state at the time of the confession, was found to violate the defendant's due process rights. *Leyra v. Denno*, 347 U.S. 556, 559-561 (1954).

The Supreme Court has thus clearly established that a defendant's coerced testimony cannot be used against him at trial. However, no Supreme Court authority addresses the issue of whether coerced witness testimony can be used against a defendant at trial. In all the cases cited above, the defendants argued that their confession to a crime had been coerced by state actors. Here, Bracken is arguing that statements made by a witness, implicating him in the sexual abuse crimes, were coerced. It is not clearly obvious that the rules established in the cases above would apply to Bracken's claim, which is distinct from those cases concerned with a defendant being forced to condemn himself. Because no Supreme Court case addresses the specific question presented, there is no clearly established federal law that the state court decision could be contrary to or an unreasonable application of. *See Carey*, 549 U.S. at 77. Bracken is thus not entitled to relief on this claim.

E.      <u>Sentencing Claim (Ground 13)</u>

Bracken argued in a state habeas petition that the trial court originally sentenced him to seven years' imprisonment but erroneously amended the sentence the following day. The superior court denied the claim, finding that Bracken failed to state a prima facie case for relief. Bracken fares no better on federal habeas review. The record before this court indicates that Bracken was sentenced to a determinate term of seven years' imprisonment plus an indeterminate term of 30 years to life imprisonment. The record also includes a notice of appeal that was filed on October 28, 2011, in which the clerk of the superior court erroneously indicates that Bracken had only been sentenced to seven years in state prison. However, on November 3,

2011, the clerk filed an amended notice of appeal that corrected the mistake by reflecting that Bracken was sentenced to state prison for seven years plus 30 to life.  The "amendment" was thus only the correction of a clerical error; the record is devoid of any indication that the trial court ever amended his sentence.  Bracken's sentencing claim therefore fails.

F.      Jury Claims (Ground 14)

Bracken next argues, as he did on state habeas, that the jury selection process was tainted because: 1) the father of two of the victims talked to prospective jurors outside of the courtroom; and 2) he was escorted into the courtroom in shackles in view of prospective jurors who were waiting outside the courtroom.  The superior court denied Bracken's claims, concluding that he failed to state a prima facie case for relief.

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors."  *Irwin v. Dowd*, 366 U.S. 717, 722 (1961); *see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir.1998).  Although doubts regarding bias must be resolved against the juror, the defendants bear the burden of showing that the prospective juror was actually biased, and that the [trial] court abused its discretion or committed manifest error when it failed to excuse her for cause."  *United States v. Maloney*, 699 F.3d 1130, 1135 (9th Cir. 2012) (internal citations, brackets, ellipses, and quotation marks omitted).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel."  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1997).

Bracken fails to demonstrate, however, the existence of juror bias or improper influence on the jury.  Although Bracken alleges that he and his attorney saw the father of two of the

victims talking to prospective jurors and alerted the court, he provides no record support for his assertion.  Bracken explains in his Traverse that he does not have access to the transcripts and therefore can only describe what happened at trial.  But this Court has independently reviewed the record and cannot find any support for Bracken's claim.

The record does indicate, however, that defense counsel alerted the Court that Bracken was escorted into the courtroom in shackles in view of potential jurors.  The record reflects that defense counsel informed the trial judge that the glass windows of the hallway used to escort prisoners to the courtroom, which are typically covered by a shade, were uncovered when a handcuffed Bracken was escorted into the courtroom before the jury selection proceeding to hear hardship requests.  The trial court told defense counsel he could reserve the issue until after the hardship requests were heard.  The record does not indicate that defense counsel re-raised the issue.  It could be that all the potential jurors who had potentially seen Bracken, and who were requesting to be excused from jury service due to hardship, were excused and not seated on Bracken's jury.

Because Bracken provides no evidentiary support for either of his claims, and did not provide evidentiary support for his claims before the state courts, the state courts' conclusion that Bracken failed to state a prima facie case for relief does not contravene or unreasonably apply federal law.  *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations unsupported by a statement of specific facts do not warrant habeas relief); *see also Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) ("the petition is expected to state facts that point to a 'real possibility of constitutional error'" (citation omitted)); *James v. Borg*, 24 F.3d 20,

26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").  Bracken is not entitled to relief on this ground.

G.    Cumulative Error (Ground 16)

Finally, Bracken clams that the cumulative effects of the above errors warrant reversal of his conviction.  "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence  in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process.  *See Chambers*, 401 U.S. at 294.  As discussed above, however, Bracken does not allege any claims that amount to error, and thus he demonstrates no errors that can accumulate to a level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).  Accordingly, Bracken is not entitled to relief on his cumulative error claim either.

H.    Evidentiary Hearing (Docket No. 45)

Bracken further requests an evidentiary hearing on all of his claims.  A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or

(b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963).  *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005).  In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.  *Id.* at 670 (quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

As discussed above, Bracken has failed to assert a colorable claim for relief.  *See Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir. 1984) (holding an evidentiary hearing is not required on issues which can be resolved on the basis of the state court record).  Because he does not cite to new laws or underlying facts that were not developed on the record before the state courts with respect to this claim, he has also failed to satisfy his burden of proof under 28 U.S.C.

§ 2254(e)(2).  Bracken's request for an evidentiary hearing at Docket No. 45 must therefore also
be denied.

## V. CONCLUSION AND ORDER

Bracken is not entitled to relief on any ground raised in his Petition and is not entitled to
an evidentiary hearing.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ
of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the request for an evidentiary hearing at Docket
No. 45 is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of
Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain
a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree
with the district court's resolution of his constitutional claims or that jurists could conclude the
issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,
537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the
Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 26, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge